LAURA A. BRIDGEMAN v. MARGARET M. McCLOUD, et al.

Eastern Section. September 18, 1926.

Kelly & Kelly and Harry S. Hyman, guardian ad litem, all of Knoxville, for appellant.

Lindsay, Young & Young, of Knoxville, for appellee.

SNODGRASS, J. This is a bill to collect three negotiable promissory notes, two for one thousand dollars each and one for fifteen hundred dollars, together with interest and ten per cent attorneys fees provided for in the face of said notes. The notes were dated Feb. 12, 1920. They were signed by Ashley M. Mc-Cloud and Margaret F. McCloud, were due twelve months after date, and payable to S. R. Rambo & Co.

To secure the payment of said notes a deed of trust was executed by the makers, of even date therewith, on the land described in the bill and in the final decree in this cause, and the bill seeks also to foreclose the lien and subject the property to the payment of the notes, interest and attorneys fees.

Shortly after the execution of the notes, and before maturity, and at their face value, the notes were endorsed by S. R. Rambo and S. R. Rambo & Co. to the complainant, and they were delivered to her at said time, and she has at all times since been the holder thereof in due course and the same have been in her possession.

The bill averred that complainant, within the last few weeks, had learned for the first time that on the 12th of July, 1923, James A. Gleason, without authority or right, fraudulently and wrongfully entered on the margin of the book in which said mortgage is recorded, and opposite the same, a statement as follows:

"I declare that I am the true and lawful holder of the claim secured by the instrument within recorded, and hereby acknowledge the satisfaction thereof and discharge of all lien to secure the same in full. This 12th day of July, 1923.

S. R. Rambo & Co.,
James A. Gleason, Sec."

The bill charged that said endorsement made on said book was made at a time when the complainant was the owner in due course of the notes secured by the deed of trust, and that said entry so made on the margin of the book was fraudulent, unauthorized and void, and it was sought to have it so declared and the land subjected, as aforesaid.

In the meantime Ashley M. McCloud had died and his widow, the joint maker of the notes and deed or mortgage, was made party, as well as the other defendants, who were his heirs at law, under the allegation that the land had descended to them charged with the obligations of the lien, and that the said Ashley McCloud had died intestate and defendant Frank J. Young was his administrator. The defendants Paul, James and John McCloud were minors, and answered formally through their guardian ad litem, Harry S. Hyman.

The administrator and the widow and joint maker of the notes filed elaborate answers denying all liability, and denying that the complainant was the holder of the notes in due course, and claiming that said notes had been paid to S. R. Rambo & Co.; that five hundred dollars thereof had been paid by the said Ashley M. McCloud to the said S. R. Rambo & Co. on or about the 13th day of February, 1922, and that after his death, on or about the 12th day of July, 1923, the remaining amounts due on same had been paid by the said widow and administrator to the said S. R. Rambo & Co., who had, through the said Gleason, their agent or employee, properly acknowledged satisfaction of said notes and lien upon the records aforesaid, and it was denied that his said act was in any way fraudulent or unauthorized, or that there was due anything on said notes, or that any lien existed to be foreclosed.

It was claimed that S. R. Rambo & Co. was the agent of the complainant at the time of said alleged payments and had authority, express or implied, to receive the payment for the complainant, but that in any event the relations of the complainant and S. R. Rambo & Co. were such, with reference to said notes and trust deed, as to hold said Rambo & Co. out to the public, with the knowledge and consent of the complainant, as having authority from and for her to receive payment of principal of said notes, and acting upon which the payments were induced, and that complainant was estopped to deny such authority, and therefore was not entitled to collect said notes or enforce said lien.

This defense was put in with a great deal of argumentative detail, not necessary to be set out herein, but the answers are referred to at large for the particularity of their statements.

Later an amended answer was filed, in which it was averred:

"That the complainant, Laura A. Bridgeman, did not list for taxation the notes sued on in the original bill in this cause as required by Chapter 602 of the Public Acts of 1907, for any of the years during which complainant has held said notes, nor had

complainant paid any personal property tax upon said notes, as is also required by said Act.''

Proof was taken and the cause heard before the Chancellor on the 16th day of June, 1925, upon the whole record, and argument of counsel, when the court was of opinion and decreed:

That the complainant was at the time of the filing of the bill, and still is, the holder in due course of the notes sued on in the bill; that the said notes were and are secured by certain real estate, which was thereupon described; that Ashley M. McCloud and defendant Margaret M. McCloud executed a deed of trust upon said real estate to complainant, which deed of trust was recorded in the Register's Office in Book 234, page 230, and that by virtue of said deed of trust complainant had a lien upon said tract of land; that the attempt made by S. R. Rambo and James A. Gleason to release of record said deed of trust on the book in the office of the Register of Deeds was without authority or right, and was wrongfully made and did not affect complainant's lien given under and by virtue of said mortgage; that the equity in said property was at the time of the filing of the bill and is vested in the defendants, Margaret M. McCloud, Paul McCloud, James McCloud and John McCloud, and the court decreed that the complainant have judgment against Margaret M. McCloud, one of the makers of the notes sued on, and Frank J. Young, Administrator, for the sum of $3500, the principal sum of said notes, plus $315 interest thereon from Jan. 1, 1924 to the date of the decree, plus $350, ten per cent attorney's fee, making a grand total of $4165, and the Clerk and Master was directed, after advertising the land as provided in the decree, to sell the same at public auction for cash in hand, to the highest bidder, in bar of the equity of redemption, and apply the proceeds to the payment of the judgment thereon by the decree granted, the balance, if any, being directed to be paid Frank J. Young, Administrator. Execution was also awarded against the defendants for costs.

All of the defendants excepted to the decree, prayed and were granted an appeal therefrom to this court, upon bond being given as required by law, and the defendants Frank J. Young, Administrator, and Margaret M. McCloud perfected their appeal and have assigned the following as errors:

"I. The Chancellor erred in rendering a judgment in favor of the complainant and against the defendants, Margaret M. McCloud and Frank J. Young, Administrator, for $4,165, or any other sum.

"II. The Chancellor erred in declaring a lien to exist in favor of the complainant and against the land of the defend-

ants, described in the original bill, for $4,165, or any other amount, and in ordering the same sold in satisfaction of said alleged lien.

"III. The Chancellor was in error in failing to find that S. R. Rambo or S. R. Rambo & Company had express or implied actual authority from the complainant to receive payment upon all notes held by her, and especially the note herein sued on; and that the notes herein sued on, having been paid to said Rambo or Rambo & Company, the same have been paid in full to complainant.

"IV. The Chancellor further erred in failing to find that the complainant by her course of dealings with Rambo or Rambo & Company over a period of eleven years, in conjunction with many others who loaned money through Rambo & Company, had held out Rambo or Rambo & Company as her agent, with authority to receive payment of the principal of notes held by her; and in failing therefore to decree that she was estopped to deny the authority of Rambo or Rambo & Company to receive the payment of the principal of the notes herein sued on as the same was made by the defendants.

"V. The Chancellor further erred in finding that complainant was the innocent holder in due course of the notes herein sued on; and in failing to find that complainant merely deposited with Rambo or Rambo & Company sums of money for him or it to loan for her, as her General Loan Agent, which money he was to receive payment of after maturity of the notes, and to re-loan for her, that she might be drawing regularly an interest income therefrom.

"VI. The Chancellor erred in taxing the defendants herein with the costs of this cause, as the complainant failed to list the notes sued on for taxation, in compliance with the law; and all the costs of this cause should therefore have been adjudged against her.

"VII. The Chancellor erred in finding that the release of record of the trust deed securing the payment of the notes herein sued on, by S. R. Rambo & Company, was done without authority or right and was wrongfully made, and that the same did not affect complainant's lien given under said trust deed.

"VIII. The Chancellor further erred in failing to find that the complainant and Rambo or Rambo & Company had

formed a relationship of principal and agent which extended over a period of years, in which relationship said Rambo was given full authority to do all things in connection with loans evidenced by notes held by the complainant, including the receiving of the principal thereof, and that such authority was actual and real, and that therefore payment to Rambo, having been made by the defendants, constituted payment to the complainant and discharged the notes herein sued on."

The complainant is a woman some sixty years of age and, as manifest from her deposition, not very familiar with business terms or the effects of business transactions. Her husband died and she took the money, some eight thousand dollars, which she obtained as insurance upon his life, together with certain other sums which she obtained on the sale of property to S. R. Rambo & Company, to be invested for her, evidently, and largely upon the advice of said company or S. R. Rambo, who owned and dominated it. For several years, about eleven, before the failure of Rambo and his company in 1924, this fund was invested in notes and securities belonging to said Rambo or his company. In relation thereto she testified:

"Yes, I have held different notes, because sometimes he would 'phone me to come in and take up—that people wanted to pay off—and he would make new notes for the amount."

"Q. And you would surrender your old notes? A. Yes.

"Q. And he would give you new notes? A. Yes, sometimes he would get them ready while I was there and give them to me, and sometimes he would be a little busy and he would mail them to me."

The notes in question she acquired a few days after they were executed, and were paid for in money which she had on deposit with him. They were delivered to her by S. R. Rambo & Co., as stated, a few days after they were executed, through the mail, as was also the mortgage and the insurance, and remained in her possession until the bringing of this suit.

At the time of such delivery there were no equities that could have been urged against their payment. Nor do we believe that any have accrued since that would prevent the collection of the notes and the enforcement of the lien for her benefit in this suit. The notes were negotiable on their face, and whatever may have been said by Rambo or his agents or employees to the borrowers who executed them regarding the time or the place of their payment, and the person to whom they might be paid, they were executed with the knowledge that they were the subject of transfer, and that when properly transferred they would belong to

the holder, and that the holder and none other would be entitled to receive payment; that the transfer of the notes would likewise effect a transfer of the security to the holder, for whose benefit and under whose control the same would thereafter be held. Each of these notes when they were transferred were endorsed by S. R. Rambo & Co. and by S. R. Rambo, under the following contract of guaranty:

"The undersigned endorser of this note hereby guarantees payment of principal and interest of this note, and all costs of collection."

So that during the time these notes were running, and notwithstanding Rambo or Rambo & Co. paid the interest, there was no reason to assume that he was collecting the interest as the agent of the holder, but rather, if he had any relations with the makers of the notes in collecting from them, that he was representing himself insofar as he was dealing with them, and protecting his own independent obligation to see that the interest was paid. While it does appear that on Feb. 13, 1922 Rambo received of Ashley McCloud the sum of $500 on these notes, for which on a printed form containing the name of S. R. Rambo, Agent, a receipt was given signed by Mrs. S, and on the same date an extension of twelve months on the remaining $3000 was given signed by S. R. Rambo, the complainant never knew of this payment, nor that Rambo was assuming to receive it as her agent. The extension does not purport to have been made as agent, nor did his granting it make him her agent necessarily.

As stated, he was bound on the note as endorser and guarantor, and there was no reason why he could not have effected a valid contract to renew the note. If he could not effect a renewal by a contract with the holder, there was nothing in the way of his taking up the note and having the same retransferred to him, and thus making good his contract of extension with the maker. That Rambo in these transactions represented himself, is as far as their construction, in the absence of express agreements, need to go, to preserve the equities, and it would, it seems to us, be a strained construction to overlook the primary obligations of Rambo & Co. and impute agency to it of the holder in the collection of the interest from the maker as a circumstance to show agency in the collection of the principal. Had Rambo & Co. had no personal and independent obligations in the payment of these notes, there might have been reason to assume that in the reception of interest and principal he was assuming an agency to represent the holder, and repeated recognition of such actions under such circumstances might have been sufficient to imply assent to such authority, but

that is not this case. This woman thought she was receiving part of the time seven per cent interest, and Rambo's personal checks should be regarded as in response to his personal obligations.

In the case of Ross v. Gossett, a case very similar to this, this court said upon this point:

"To hold that a holder of a note endorsed by responsible and solvent parties cannot receive the principal or interest from the endorser without constituting the endorser his agent and becoming responsible for his transactions had with the maker, would undermine and destroy the sound basis of negotiable paper and disrupt business, while the benefits to be derived by creating an agency by implication of law would be inconsequential, only protecting the makers against their own negligent acts and folly. A simple act of prudence in requiring the production and surrender of a note affording them all the protection a reasonable party should expect."

In addition to the foregoing observation, the injurious consequences of adhering to a rule of implied agency in a case like this, results from the fact that the holder himself may have transferred the note, thus terminating any agency either express or implied, and the policy of the law should not be to place any restrictions or peril upon dealing in these negotiable securities other than those that necessarily inhere. Many of these can be avoided and safety better subserved by adhering strictly to the general rule announced in the case of Griswold v. Davis, 125 Tenn., 229, in language which it is again pertinent to quote:

"We are of opinion that as a general rule the debtor is not justified in paying the principal debt to an agent of the holder who is not expressly authorized to receive it, unless the agent, at the time of payment, has in his possession the securities paid and makes the fact known to the debtor, and, if the person to whom payment is made is not in possession of the written securities, the burden is upon the debtor to show that the one to whom payment was made had special authority to receive payment, or that he has been represented by the creditor to have such authority. There can be no basis for the debtor relying upon the apparent or ostensible authority of an agent not in possession of the written securities to receive payment. The mere act of paying the principal debt to one not the holder of negotiable instruments, and not in possession of them, is such gross negligence upon the part of the debtor that it is difficult to conceive how he could rely upon an apparent or ostensible authority of such agent to receive the payment. Possession of the securities properly endorsed of itself, and in the

absence of countervailing facts, clothes the agent with apparent authority to receive payment from and deliver them to the debtor. And the absence of the securities in the hands of the alleged agent is such a powerful circumstance of want of authority, that one making payment to him cannot claim that he appeared to have authority to receive payment, when in fact he did not.

"Agency rests upon contract between the principal and the agent. This contract cannot be made to appear to a third party by the declarations of the agent only, nor can the principal be held bound by a course of conduct upon the part of the agent unknown to him. For the acts of his agent within his express authority, the principal is liable because the act of the agent is the act of the principal. For the acts of the agent within the scope of the authority which he holds the agent out as having, or knowingly permits him to assume, the principal is made responsible, because to permit him to dispute the authority of the agent in such case would be to enable him to commit a fraud upon innocent persons. The same principle of equity which forbids the principal to deny responsibility for the acts of his agent within the scope of his apparent authority requires that the party dealing with the alleged agent shall show that he was aware of the acts from which the apparent authority is deducted, that he acted in reliance upon them, and that he did not act negligently, but used reasonable means to ascertain whether the power was possessed by the agent, or that in good faith he believed the agent was especially authorized to do the thing."

We think that the purchase of these notes in the manner shown, so endorsed and guaranteed by Rambo and his company, thus containing his independent obligation, his reception of payment under the circumstances from the makers could be nothing more than as agent of the maker to transmit the payment to the holder, and that they must abide the consequences of their own risk when the notes were paid to Rambo & Co., knowing that they were thus outstanding in the hands of a customer who had made no formal representations to them as to Rambo's relationship, nor were they aware of any specific dealings of the complainant with Rambo and his company, from which any agency might have been implied. There is, therefore, no question of estoppel in this case.

In the case of Ross v. Gossett, supra, it was said:

"An implied agency is an actual agency and is a fact to be proved by deductions or inferences from other facts, while

in a strict sense agency by estoppel should be restricted to cases in which the authority is not real but apparent. Agency by estoppel can be invoked only when the third party knew and relied on the conduct by the principal, while in cases of true implied agency he need have had no knowledge of the principal's act, nor have relied upon the same; the agent by implied authority being an actual agent, the principal is liable for his acts the same as though the authority had been expressed."

While it is true that Rambo & Co. in other dealings with the complainant may have himself collected notes and notified her to bring them in and receive payment, these notes, carrying its and Rambo's personal endorsement and independent obligations, gave them such a personal interest and right to look after them to protect their own obligations as to negative any idea or inference that Rambo or his company was assuming any such agency for the complainant as to create a liability against her for his actions. But even were it otherwise, it would only amount to a ratification of his actions in the few instances shown where he made collections, and would not bind her to a continued acquiescence in such assumed authority.

While it might be inferred from part of her testimony that with reference to other loans Rambo was regarded as an agent to collect from her, as for instance, she was asked:

"Q. And you never did go to these various people whom you had notes on and notify them that you were the holder of the notes—in other words you were looking to Mr. Rambo to collect the notes? A. Well, anybody else would.

"Q. And to collect interest? A. Yes.

"Q. And to send the money to you? A. Yes.

"Q. And when he collected the principal he notified you to come in, and you surrendered your notes? A. Yes.

"Q. That is the way you dealt? A. Yes, and took up new ones."

Yet we think it is manifest from her entire deposition that what was meant, she was relying upon Rambo's independent obligation assumed by the contract of endorsement. The witness was ignorant of business terms, inaccurate in her definition or interpretation of business transactions. She stated again:

"I did not know. I had never taken up any notes. I didn't know I was to be so particular about it. I thought as long as the mortgage was there and the note was there it was all right, and he would still send me the interest on it."

And again, with reference to foreclosure:

"No, I didn't know anything about that. I thought people had to release their own property when it was sold, but I never had taken up any and didn't know."

It is earnestly contended that this case should be distinguished from the many cases of a similar nature that have run the gauntlet of the courts following the failure of Rambo & Co., but a careful examination of the record in our opinion furnishes no reason for a different result than those of the many others that have preceded it. Rambo's big real estate and loan business had the proportions of a big banking business, and we are satisfied that its many customers knew about as much of its individual transactions with others as they were calculated to know of such transactions in such a bank. We are convinced that complainant knew but very little more of the business of Rambo & Co. than what was comprised in her own transactions with it.

Mr. Gleason, a long time employee, was introduced to show the manner and custom of Rambo and his company in the loaning of money, the sales of securities, the renewal of notes, and the collection of interest and principal, and the effort was to show that all who dealt with him constituted him and his company a general agent, either expressly or by implication, with plenipotentiary power to act fully in the settlement of a loan or the collection of a security. While Mr. Gleason testified freely his opinion as to the legal effect of various transactions, it was with apparent inaccuracies as to some, and inadequacy as to the establishment of the main proposition. He admitted that there were instances in which some borrowers refused to pay their notes when called for, and that there was a very small percentage of actual note holders who signed releases of record; and while a very large percentage of the customers of S. R. Rambo & Co. may by express contract have so constituted the company their general agent, and of course all did to which he so testified, yet it does not follow that the complainant did; and he even so admitted that others did not; and while he himself, as an employee, dealing with many customers, to whom he explained things, knew much of these contract arrangements, yet it does not follow that the customer knew as much as he, because such customer's transactions were relatively few. But Mr. Gleason himself since the "blowout," as he terms it, has learned some things that he did not know before. Regarding the defendants, Mrs. McCloud and the Administrator, they knew or were informed when they went to pay off the notes that they were in the hands of a customer. They knew that that customer alone had the right to receive it. Having under these circumstances paid the money to Rambo & Co., they must be held simply to have made

the company their agent to procure the notes and send to them, and to the knowledge that the customer was or would be entitled to hold the notes until he was paid.

"Where an instrument payable at a bank is lodged with the bank for collection, the bank becomes the agent of the payee to receive payment. Where such instrument is not lodged with the bank, whatever the bank receives from the maker to apply on the instrument, it receives as the maker's agent, and not as the agent of the payee. Ward v. Smith, 7 Wallace (U. S.), 447.

"Even payment to a broker acting as agent of both parties, but as the agent of the maker in respect to receiving payment, does not relieve the maker from liability to the payee. Uniform Laws Annotated, Neg. Instr., p. 421.

"Where a person purchases a note from a broker, and takes from him the note purchased, the broker is not the agent of the purchaser to receive payment thereof in the absence of express authority to so act. Uniform Laws Annotated, Neg. Instr., p. 421.

"The collection by the agent of other securities, or even a part of the existing debt, is not sufficient to raise the implication of authority of the agent to receive payment of the debt. Uniform Laws Annotated, Neg. Instr., p. 422.

"It is a general rule that an agent with authority to make loans or to contract for its principal, and to take notes or securities in settlement, will not be presumed to have authority to make collections on such notes or securities if they are not left in his possession by the principal. The third person assumes the burden of knowing at his peril that the agent possesses the notes or securities at the time each payment is made, and if, as a matter of fact, he has parted with such possession, payment to him will not discharge the debtor of liability to the principal, unless the money actually reaches the latter. Cyc., Vol. 31, pp. 1371, 1372.

"Even though the principal may have been accustomed to permit the agent to make collections, the rule with respect to nonpossession of the securities raises the implication of the termination of the power, and rebuts the assumption of authority." Idem.

When the necessity or desirability of preserving the freedom of contract and transfer of these negotiable instruments is to be preserved, it is difficult to perceive how any other rule can be consistently enforced. No good reason is to be subserved by a presumption of any continued authority, which in effect would amount to the introduction of uncertainty into these transactions and an

enlarged basis of litigation. Other authorities were cited in the brief along the same lines, but we do not deem it necessary to pursue the discussion further. While we do not mean to hold that an implied authority in an agent to receive payment in the absence of possession of the securities cannot exist, it must be established by clear proof, and with reference to the particular payment, or such as would inevitably include it, as such transactions are in their nature so disconnected and severable that convenience and safety would require that each case be regarded as terminative of the relation.

On the whole we agree with the conclusions reached by the Chancellor, and overrule the assignments of error, save in the particulars as to costs and the tax matter.

It appears from the proof that these notes in the hands of the complainant were, and are, liable for taxation, and have been for some years, at least since Jan. 10, 1921, and that they have not been given in for taxation. As was held in the case of Katherine Parker, et al. v. Carl E. Luttrell, et al., recently decided by this court, the Act of 1907, Chapter 602, provides:

"That in any suit hereafter brought in any of the courts of this state, upon any note, bill, bond, or other chose in action subject to taxation under the provisions of this Act, it shall be competent for any defendant to such action to allege and show in defense that such note, bill, bond, or other chose in action was not given in or included in the owner's assessment for taxation for the preceding year, and upon such defense being established to the satisfaction of the justice, court or judge trying the case, the owner or holder bringing suit upon said note, bond, bill, or other chose in action shall be taxed with all the court costs of the case, and the said court shall declare in rendering such judgment a lien in favor of the State, county or municipality to which said unpaid taxes are shown to be payable, said lien to be discharged by a release on the docket of said court showing the payment of the said taxes, said release to be executed by the proper tax collecting officer or officers; Provided, all renewals of notes, bills, bonds, or other choses in action shall be treated as one continuous debt; and Provided, further, that unsettled accounts shall not be included in this section."

And it appearing that this fact of delinquency was alleged and proven, the Chancellor should have given effect to it in accordance with its terms, and failing to do so he was in error.

Giving effect, therefore, to the statute, as was done in the case last above referred to, the complainant, Laura A. Bridgeman, will

pay all the costs of this cause, and the Chancellor's decree is modified to this extent and so as to declare a lien for taxes, otherwise it is affirmed. The cause will be remanded for a sale of the property upon which the judgment has been declared a lien in accordance with the Chancellor's decree. A lien is declared upon the recovery of the complainant for all taxes that may be properly due under said Act in favor of the State of Tennessee, county of Knox and the Municipality of Knoxville by reason of the ownership of said notes.

Portrum and Thompson, JJ., concur.