**In re William Alvin FROST and Emily Jean Frost, Debtors.**

**Bankruptcy Nos. 79–10044, 79–10045.**

United States Bankruptcy Court, M. D. Tennessee.

Nov. 26, 1979.

Richard Marshall, Nashville, Tenn., Robert F. Spann, Nashville, Tenn., for William and Emily Frost.

John W. Nelley, Jr., Nashville, Tenn., for Wm. B. Allen and wife Judith Allen.

## MEMORANDUM

RUSSELL H. HIPPE, Jr., Bankruptcy Judge.

The debtors-in-possession, William Alvin Frost and wife, Emily Jean Frost, have objected to one of two claims founded on the same promissory note (hereinafter the "Note") payment of which is secured by an installment deed on a valuable tract of real property. One claim was filed by Springfield (Tennessee) Production Credit Association (hereinafter "SPCA"). The other was filed by William B. Allen and wife, Judith E. Allen (hereinafter the "Allens"). SPCA is the holder of the Note. The Allens had pledged the Note to secure payment of their obligations to SPCA.

The Frosts do not contest their obligation as makers to pay the principal and interest due on the Note and have accepted the claim of SPCA. They have objected to the claim of the Allens. Both claims include the same amounts for principal and interest but while the claim of SPCA includes only the additional sum of $100 for attorneys' fees, the claim of the Allens includes additional sums of $69,333.70 for the fee of one attorney, $5,000 for the fee of a second attorney, $6,933.37 for the fee for the trustee under the installment deed and $531.32 for other miscellaneous expenses.

## SUMMARY

In the opinion of the court the objection to claim of the Allens is well-founded under applicable state law and must be sustained. The provision in a promissory note for payment of attorneys' fees and other collection expenses is deemed by Tennessee courts to be a constituent part of the obligation and the courts of this state have adhered strictly to the general rule that only the holder or a properly authorized agent of the holder has the right to receive payment on a negotiable promissory note. Pursuant to Rule 914 of the Bankruptcy Rules the court required the Allens to file a written response to the objection and neither in that response nor in their post-hearing brief have the Allens asserted that they were either the holder of the Note or agents of the holder authorized to receive payment for the holder. The Allens have never questioned the status of SPCA as the lawful holder of the Note. They have acknowledged the right of SPCA to receive payment of the principal and interest due on it (except to the extent that one of their attorneys might be entitled to 10% of the principal and interest as his fee.) The Allens and their attorneys have pursued a course of conduct consistent only with the proposition that as the pledgors of the Note they had the unqualified right to collect it and be reimbursed for attorneys' fees and other collection expenses incurred by them as provided in the Note.

Courts in other jurisdictions have permitted pledgors to collect pledged instruments in their own names usually when the amount due on the pledged instrument exceeded the amount of the debt secured by it and the pledgor was not in default and was proceeding with the consent of the pledgee who had returned the instrument to the pledgor. A few cases have accorded a pledgor the right to collect when he had an interest in surplus even though he apparently had not regained possession of the instrument. An even fewer number of cases have indicated that a non-holder pledgor with no interest in surplus may be

entitled to collect by judicial proceeding which includes the pledgee as a party but only after the pledgee has refused to do so. In no reported case which this court has been able to uncover has this collection right of a pledgor been extended to provide a non-holder the right to collect by non-judicial means. Thus, the reported decisions from other jurisdictions are not supportive of the Allens' position. The Allens owed SPCA more than the amount due on the Note, they were in default on their obligations to SPCA, they had not obtained the consent of SPCA to collect the Note, SPCA had not refused to collect it, and the bulk of the attorneys' fees which are the major additional item included in their claim were incurred in connection with a non-judicial foreclosure. In any event, the collection of a negotiable instrument by a non-holder pledgor is such a significant exception to the general rule restricting collection rights to the holder and is so inconsistent with prior decisions by the Tennessee courts that, in the opinion of this court, it would be permitted in this state in only the most limited circumstances, if at all.

### FINDINGS OF FACT

From the pleadings, testimony of witnesses at the hearing, exhibits, statement of counsel and the entire record the court makes the following findings of fact, although it would appear that there is no significant factual dispute, the principal issue to be resolved being one of law:

1. In the Fall of 1977 the Frosts purchased from the Allens for $1,000,000 one of the most celebrated privately-owned antebellum mansions in the South, "Rattle and Snap" [1], which included approximately 400 acres of land in Maury County, near Columbia, Tennessee. The Frosts paid the Allens $400,000 in cash and executed the Note payable to the Allens' order for the balance of the purchase price. The principal of $600,000 together with interest at 8½% per annum was due on November 1, 1978. Pay-

ment was secured by an installment deed on "Rattle and Snap".

2. The Note contained the following pertinent provision:

"We, the makers and endorsers, jointly and severally waive demand, notice and protest, and in the event of default of payment we agree to pay expenses incurred in collecting this note, including attorney's fee."

3. In the installment deed the Frosts conveyed title to "Rattle and Snap" to one James Burt, as trustee who "at the option of the lawful owner and holder" of the Note was authorized to sell the property if the Note was not paid when due. The installment deed contained no undertaking by the Frosts to pay attorneys' fees or other expenses of collection independent of the Note. It did provide, however, that in the event of sale the trustee would apply the proceeds first "[t]o pay all the costs and charges of executing this Trust including Attorneys' fees and all expenses of any litigation which may arise on account of the execution and enforcement of this Trust or the lien contained herein" and then to "the debt evidenced by" the Note.

4. Soon after receiving the Note from the Frosts the Allens indorsed it to SPCA and pledged it to secure their indebtedness to SPCA. During the entire time that SPCA held the Note the indebtedness of the Allens to SPCA has exceeded the amount due or to become due on the Note. At the time that the Note was pledged to SPCA a prior indebtedness exceeding $700,000 was renewed and they received additional advances exceeding $300,000. By March 1, 1979, their indebtedness had increased to an amount in excess of $1,300,000. SPCA held other collateral for the Allens' indebtedness. The total value of all such collateral, including the Note, was roughly equivalent to the amount of their indebtedness in March, 1979.

---

1. Apparently there are many explanations as to the origin of the name, "Rattle and Snap". One considered most likely is that it was derived from the name of a game of "beans" in which a relative of President James K. Polk won a large tract of land upon which the mansion was later constructed. J. Smith, White Pillars 72 (1941).

5. By letter dated November 16, 1977, SPCA advised the Frosts that the Note was being held by and all payments should be made to SPCA. A copy of this letter was sent to Mr. Allen.

6. In April, 1978 SPCA loaned the Frosts $65,280. Payment of this loan was secured by a second mortgage deed of trust on "Rattle and Snap".

7. Prior to the November 1, 1978, due date of the Note Mr. Frost requested that SPCA make a loan to be secured by "Rattle and Snap" and other property in Ohio, the proceeds of which would pay off the Note and SPCA's second mortgage loan. SPCA had been receptive to making such a loan but was deterred from doing so when in December, 1978 the Internal Revenue Service filed a tax lien against "Rattle and Snap" for approximately $75,000.

8. A substantial payment was due to SPCA on the Allens' indebtedness on December 1, 1978. Because SPCA was contemplating making the loan requested by Mr. Frost extensions were granted through January 31, 1979. Since February 1, 1979, the Allens have been in default on their obligations to SPCA.

9. Sometime in January, 1979, SPCA concluded that it would be unable to make the loan to pay off the Note because of the I.R.S. tax lien. The president of SPCA, Mr. Gary Haynes, advised Mr. Allen of this development and inquired as to what Mr. Allen was going to do relative to payment of the Note.

10. Mr. Allen conferred with Mr. Frost at "Rattle and Snap" on February 10, 1979, and, although he advised Mr. Frost that he would help as long as he could and would try to find a buyer for him, he concluded that a foreclosure sale under the installment deed was probably necessary.

11. Although Mr. Allen testified that he had not kept up with the interest rate changes on the Allens' indebtedness to SPCA he was conscious of the fact that the delay in payment of the Note was costing him money. Since the Note matured the rate of interest on the Allens' indebtedness had been greater than the Note rate. By January 1, 1979, it had increased to 10½% per annum, a rate differential which was costing the Allens approximately $1,000 per month.

12. Mr. Allen met with Mr. Haynes on February 19, 1979. He advised Mr. Haynes that Mr. Frost appeared to be working as hard as he could to sell or refinance "Rattle and Snap" but the prospects were not good and foreclosure would probably be necessary. Apparently both men thought the I.R.S. lien a complicating factor. The employment of attorneys was discussed. Mr. Allen mentioned that he was considering getting an attorney to represent him and was "going to talk to my attorney." Mr. Haynes indicated that he could get a local attorney to handle the foreclosure.

13. It had been Mr. Haynes's desire to give the Frosts and the Allens a chance to work things out together but by the first of March he realized this was not likely and had "got down to being serious about" the Note.

14. Mr. Allen and Mr. Haynes met on March 3, 1979, on another matter but discussed the Note. Again the I.R.S. lien was mentioned as a possible problem. Mr. Allen indicated that he wanted to hire his attorney to collect the Note. Obviously concerned that a sizeable fee would jeopardize payment of SPCA's second mortgage note, Mr. Haynes inquired as to what the fee was going to be and Mr. Allen responded that he did not know. Following the meeting Mr. Haynes prepared the following pertinent handwritten memorandum the contents of which were not contradicted by Mr. Allen:

3–3–79 Reg [sic] Alvin Frost

Bill Allen in my office this morning—He stated he wanted to go ahead & collect frost [sic] note so we could give him credit on loan. I told him I was sure it would cost no more than $1000. for our attorney to handle. Mr. Allen said he wanted to talk to his attorney before we commenced foreclosure—I said ok but don't make a deal without discussing & clearing with us first & we want to be sure IRS is properly notified.

It was Mr. Haynes's understanding that Mr. Allen was to get back in touch with him concerning the employment of an attorney. Mr. Allen did not do so and without any authorization from Mr. Haynes or anyone else at SPCA proceeded to employ an attorney, Mr. Phillips Turner, Jr., who promptly initiated foreclosure proceedings under the installment deed.

15. Mr. Allen had doubts that "Rattle and Snap" would bring enough money at foreclosure sale to "take care of all creditors", but apparently did not communicate this apprehension to Mr. Haynes.

16. At no time prior to initiating foreclosure or since has Mr. Allen made any demand on SPCA that SPCA foreclose or take any other steps to collect the Note.

17. At no time prior to initiating foreclosure or since has Mr. Allen requested that SPCA return the Note to him in order that he might proceed to collect it or that SPCA authorize him to act as its agent for the purpose of collecting the Note or that SPCA consent to his collecting the Note as pledgor or in any other capacity and SPCA has not done so. It is apparent from their last conversation that Mr. Haynes would have permitted the Allens to collect the Note only if the amount of the fee to be charged by their attorney was satisfactory to SPCA. It is also apparent that SPCA was ready and willing to collect the Note using its own attorney if the fee of Allens' attorney was too high.

18. When Mr. Allen employed Mr. Turner he did not advise him that the Note was held by SPCA and Mr. Turner made no inquiry as to who held it. Mr. Turner testified that he had no knowledge of any interest of SPCA in the Note until March 30, 1979.

19. Both Mr. Allen and Mr. Turner were very specific in testifying that the attorney was employed "to collect the debt". Both also testified that the fee arrangement was on a contingency basis. Mr. Turner testified that he did a lot of contingency fee work, "plain ole plaintiff's work". It is not clear from the testimony of Mr. Allen and Mr. Turner as to whether it was agreed from the outset that the fee would be a contingent one but in any event Mr. Allen did not discuss at the time Mr. Turner was employed the manner by which the fee would be calculated or its amount. It was only after foreclosure had been initiated that Mr. Allen learned that Mr. Turner intended to compute his fee on the basis of 10% of the recovery. Mr. Allen was "shocked" by the amount of the fee. He thought the foreclosure was a simple procedure.

20. The foreclosure proceedings were initiated by Mr. Turner on March 12, 1979, with the execution by the trustee of a "Notice of Foreclosure Sale" which was published as required by the installment deed. The sale was to be held on April 9, 1979. Having noted the deed of trust securing SPCA's second mortgage note in searching the real estate records, Mr. Turner wrote Mr. Haynes at SPCA on March 13, 1979 advising him of the foreclosure sale. Whether due to travel, inadvertence or both, this letter did not come to the attention of Mr. Haynes until March 30, 1979. Mr. Haynes was "shocked" to learn that Mr. Allen had initiated foreclosure proceedings and immediately called Mr. Turner and advised him that SPCA held the Note, that SPCA had not employed him and that he had no right to foreclose. Mr. Turner advised Mr. Haynes that he intended to charge a 10% attorney's fee and a 1% trustee fee. Mr. Haynes called Mr. Allen who acknowledged that Mr. Haynes was "highly upset" over the amount of Mr. Turner's fee.

21. The Chapter XII petitions were filed by the Frosts on April 2, 1979, staying the foreclosure sale.

22. On April 5, 1979, a complaint was filed in this court by Mr. Turner to lift the stay and permit the foreclosure to take place as scheduled. The plaintiffs in the complaint were the Allens and Mr. Burt, the trustee. No mention was made of any interest of SPCA in the Note although reference was made to SPCA as the holder of the note secured by the second mortgage

deed of trust. A copy of the front of the Note was attached to the complaint but not of the back on which the indorsement of SPCA appeared. No notice was given by Mr. Turner to SPCA of the filing of the complaint or of the hearing. The court on its own initiative gave notice to the junior lienholders, SPCA and the Internal Revenue Service, and as a result of Mr. Haynes's attendance at the hearing the court learned that SPCA was the holder of the Note. The complaint was dismissed.

23. Pursuant to order of the court, the debtors-in-possession sold "Rattle and Snap" on August 31, 1979 for $1,060,000. All uncontested liens against the property were paid at the closing. The claim of the Internal Revenue Service was paid in full as was the SPCA note secured by the second mortgage deed of trust. SPCA was also paid the principal, interest and the $100 attorneys' fee due on the Note less the amount claimed by the Allens for their attorneys' and trustee's fees and other expenses. This sum, together with the balance of the proceeds received from the sale of this property, is being held by the disbursing agent in interest bearing bank accounts subject to further orders of the court. This contested lien has been transferred and has attached to these funds pending final resolution of this matter.

24. A schedule attached to Allens' proof of claim recites that it is for monies owed to them by the Frosts "under the terms and conditions of an installment deed and promissory note. . . ." The attorneys' fees included in the claim are for Mr. Turner—$69,333.70; for the attorney who represented them in this contested matter after the court had directed that Mr. Turner not do so because of conflicts of interest with his clients and the likelihood of having to testify—$5,000; and $6,933.37 for Mr. Burt, the trustee under the installment deed. The balance is for miscellaneous expenses incurred in connection with the foreclosure and for pursuing their claim in this court.

### CONCLUSIONS OF LAW

It is apparent that it is the quest of the Allens' first attorney, Mr. Turner, for a sizeable fee that prompted the filing of the Allens' claim. Since the Frosts did not contest their liability to pay the principal and interest due on the Note and the Allens did not contest payment of same to SPCA there was no other reason for the Allens to file a claim. No showing has been made of any basis for any liability of either the Allens or the Frosts for any fee for the trustee under the installment deed. Not only has the trustee rendered no services, even if he had, he would be entitled to a fee under the terms of the installment deed only in the event of a sale of the property by him. The fees incurred by the Allens for the second attorney were for services rendered in pursuing their claim in this court. It was the fact that no such services were required to ensure payment of the principal and interest on the Note, but only to pursue payment of the fee of Mr. Turner, as well as other potential conflicts of interest between Mr. Turner and the Allens, that prompted this court to require that the Allens obtain the services of another attorney in this contested matter. If the Allens are not entitled to reimbursement of Mr. Turner's fee, they are not entitled to receive payment of the fee of the second attorney. The court notes that although Mr. Turner initially expressed bewilderment as to any possible conflict of interest between himself and his clients, he later filed an application with the court to be relieved as counsel for the Allens as to all matters in these Chapter XII cases.

The only basis for the claim by the Allens of the liability of the Frosts for these attorneys' fees is the contractual provision in the Note. The installment deed does not contain an independent obligation on the part of the Frosts to pay such fees. It merely secures payment of the Note, including the payment of attorneys' fees as provided in the Note. There is a provision in that instrument directing the trustee, once he has sold the property, to apply the proceeds first to the payment of attorneys' fees incurred in executing the trust but that provision is applicable only in the event of a

sale by the trustee. No suggestion has been made by the Allens of any other basis upon which they may be entitled to reimbursement for these fees. Thus, the issues raised by the objection to the Allens' claim must be resolved by application of state and not federal bankruptcy law. *Womack Lumber Co. v. Guaranty Mortgage Co. (In re Bain)*, 527 F.2d 681, (6th Cir. 1975); *In re Schafer's Bakeries*, 155 F.Supp. 902 (E.D. Mich.1957), *appeal denied for lack of jurisdiction*, 249 F.2d 448 (6th Cir. 1957).

No issue has been raised by the parties and it is apparent to the court that the Note is a negotiable instrument. It satisfies all the requirements of the Uniform Commercial Code (hereinafter the "Code") which became effective in Tennessee in 1964. Tenn.Code Ann. § 47–3–104. Neither has any issue been raised by the parties and it is also apparent to the court that SPCA as pledgee is the lawful holder in due course of the Note. Tennessee courts have long recognized that a pledgee may be deemed to be a holder in due course even if the note is pledged to secure an existing debt. *E. g., Reconstruction Finance Corp. v. Patterson*, 171 Tenn. 667, 106 S.W.2d 218, 107 S.W.2d 513 (1937); *Crane & Co. v. Hall*, 141 Tenn. 556, 213 S.W.2d 414 (1919); *Union National Bank v. Waters*, 9 Tenn.App. 608 (E.S.1929), *cert. denied* (1929). Although these cases were decided under the old Negotiable Instruments Law, there has been no change under the Code. Tenn.Code Ann. §§ 47–1–201(20); 47–3–301–303.

Significant legal consequences flow from being the holder of a negotiable instrument. The Code provides, for example, that it is the holder of a negotiable instrument who "whether or not he is the owner may transfer or negotiate it and . . . enforce payment in his own name." Tenn.Code Ann. § 47–3–301. Payment discharges the liability of any party to a negotiable instrument only to the extent that payment is made to the lawful holder. Tenn.Code Ann. § 47–3–603.

Prior to the adoption of the Code, the courts of this state had long emphasized the significance of possession of a negotiable instrument in determining to whom payment could be made to satisfy an obligation on the instrument. The leading case is *Griswold, Hallette & Persons v. Davis*, 125 Tenn. 223, 141 S.W. 205 (1911). In holding that payment to an agent of the original payee did not satisfy the obligation of the maker who remained liable on the note to a subsequent holder the court noted at 207 of 141 S.W. that "[a]s a general proposition, the maker of a negotiable promissory note can satisfy it only by payment to the holder or to his duty [sic] authorized agent for that purpose." In discussing when a non-holder might be deemed the agent of the holder the court concluded pertinently on the same page:

We are of opinion that as a general rule the debtor is not justified in paying the principal debt to an agent of the holder who is not expressly authorized to receive it, unless the agent, at the time of payment, has in his possession the securities paid and makes the fact known to the debtor, and, if the person to whom payment is made is not in possession of the written securities, the burden is upon the debtor to show that the one to whom payment was made had special authority to receive payment, or that he has been represented by the creditor to have such authority. There can be no basis for the debtor relying upon the apparent or ostensible authority of an agent not in possession of the written securities to receive payment. The mere act of paying the principal debt to one not the holder of negotiable instruments, and not in possession of them, is such gross negligence upon the part of the debtor that it is difficult to conceive how he could rely upon an apparent or ostensible authority of such agent to receive the payment. Possession of the securities properly indorsed of itself, and in the absence of countervailing facts, clothes the agent with apparent authority to receive payment from and deliver them to the debtor. And the absence of the securities in the hands of the alleged agent is such a powerful circumstance of want of authority that one making payment to him can-

not claim that he appeared to have authority to receive payment, when in fact he did not.

There is no better illustration of the strict adherence by Tennessee courts to the requirement that payment of a negotiable instrument be made to one in possession of it than the case of *Bridgeman v. McCloud*, 12 Tenn.App. 47 (E.S.1926), *cert. denied* (1927) in which the court authorized the foreclosure sale of a widow's home even though she and her deceased husband had made payments sufficient to satisfy the notes in question in full. Unfortunately payments had been made to the original payee, the notes having been indorsed and delivered to the plaintiff unbeknown to the widow. This opinion is also significant because of its discussion of whether a payee/indorser of a promissory note may by implication be deemed to be an agent of the holder authorized to receive payment for the holder. The court concluded that the payee/indorser's liability on the note militates against any implication of agency and recommends strict adherence to the rule announced in *Griswold v. Davis* that non-possession of a negotiable instrument rebuts any assumption of authority to act as agent for the holder, noting pertinently commencing on 58:

> When the necessity or desirability of preserving the freedom of contract and transfer of these negotiable instruments is to be preserved, it is difficult to perceive how any other rule can be consistently enforced. No good reason is to be subserved by a presumption of any continued authority, which in effect would amount to the introduction of uncertainty into these transactions and an enlarged basis of litigation . . . . While we do not mean to hold that an implied authority in an agent to receive payment in the absence of possession of the securities cannot exist, it must be established by clear proof . . . .

■ Thus, Tennessee courts have clearly established the general rule that only the holder of a negotiable instrument has the right to collect it and lack of possession creates a presumption of lack of authority to collect. As a consequence the burden is on the Allens to establish the basis for their asserted authority to collect. This they have attempted to do by stressing their status as pledgors. Before proceeding to review of the authorities bearing on this issue it should be noted that the right of the Allens to reimbursement for attorneys' fees is inseparably linked to and totally dependent upon their right to collect the Note.

■ Tennessee courts have consistently held that the provision for payment of attorneys' fees in a note is a constituent part of the basic obligation. Thus, in *Merrimon v. Parkey*, 136 Tenn. 645, 191 S.W. 327 (1917) the Tennessee Supreme Court held that payment of the attorneys' fees provided in the note is secured by the mortgage securing payment of the note. That court also held in the same year that the amount of such fee was to be included with principal and interest in determining what court has jurisdiction on appeal. *Fields v. Horn*, 136 Tenn. 630, 191 S.W. 331 (1917). In that opinion the court noted at 632, 191 S.W. at 331, that the attorneys' fee "is a part of the note obligation enforceable by the holder as distinguished from penalty or costs . . ." The most complete statement of the Tennessee rule that attorneys' fees are a constituent part of the obligation is found in *Jenkins v. Harris*, 19 Tenn.App. 113, 83 S.W.2d 562 (M.S.1935), *cert. denied* (1935). In holding that an appellate court has no jurisdiction to allow additional attorney's fees for services rendered on appeal the court stated pertinently at 567 of 83 S.W.2d:

> The chancellor included attorney's fees in the judgment in favor of complainants by reason of the contract for attorney's fees in the notes sued upon. In this state a fee so provided for in a note is a constituent part of the obligation, enforceable by or in behalf of the holder of the note, and it is not considered to be a distinct obligation or penalty to be enforced in behalf of the attorney or as a separate cause of action. [Citations omitted]

The principal contention of the Allens is that they as pledgors had the unqualified right to collect the Note. There is no reported Tennessee decision expressly recognizing the right of a pledgor to collect a negotiable instrument. The general rule fashioned in other jurisdictions has been stated as follows:

The right of a pledgee of a bill or note to sue upon it does not necessarily exclude the right of the pledgor to do so; and in certain circumstances the pledgor may maintain an action in his own name for the collection or enforcement of the instrument, where he has regained possession of it. His right has been consistently upheld where he has paid his debt and taken up his collateral before the trial, although the paper had not been redelivered to the pledgor, but was still held by the pledgee when the action was commenced; and it is generally held that a pledgor may sue in his own name on paper which is held by another as collateral, if he brings the action with the consent of the pledgee, which may be indicated by the pledgee's delivery of the collateral to the pledgor for the purpose of suing thereon, or for use in evidence, or for cancellation. [footnotes omitted]

12 Am.Jur.2d *Bills and Notes* § 1088 (1964).

The court in the case giving rise to a recent annotation on this point in 43 A.L. R.3d 824 indicates that this right of a pledgor to collect is an exception to "the general rule that only a holder may sue on a promissory note . . . ." *McCune v. Dynamics Research, Inc.*, 8 Ariz.App. 13, 442 P.2d 550, 43 A.L.R.3d 813 (1968). A review of the cases listed in the annotation as well as those cited in Am.Jur. indicates that in most instances the instrument had been returned to the pledgor prior to trial. Thus, in most jurisdictions recognizing the pledgor's right to collect there is no conflict with the general rule limiting collection rights to the holder. Indeed, in a number of cases, including a Tennessee decision cited in the annotation which will be discussed herein, the courts permitted the pledgor to collect only because he was the holder of the instrument. In *Haug v. Riley*, 101 Ga. 372, 29 S.E. 44 (1897), in stressing that the pledgor should be permitted to collect the note as holder the court stated at 376, 29 S.E. at 46:

It is indispensably necessary, if such instruments are to fulfill the object for which they were designed, that they should carry with them the indicia by which their ownership is to be determined; otherwise, their value, as a circulating medium would be largely curtailed, if not entirely destroyed.

One of the earliest cases in which a court expressly recognized the right of a pledgor to collect was *Simson v. Satterlee*, 64 N.Y. 657 (1876). Apparently the court was motivated to accord such a right to the pledgor because of the surplus that would be returned to the pledgor after payment of the debt which the pledged instrument secured. In most of the cases subsequently recognizing the right of the pledgor to collect, the pledgor had an interest in surplus. Only in rare instances have the courts of other jurisdictions indicated that a pledgor without such an interest might be entitled to collect the pledged instrument. One of the better discussions of the circumstances under which a pledgor may be permitted to collect is found in the case of *Rosenberg v. Cohen*, 127 Me. 260, 143 A. 97 (1928). In that opinion the court indicated that a pledgor might collect when the amount due on the pledged instrument is less than the debt it secures if the pledgee refuses and damage to the pledgor would result. In another reported opinion a court permitted a pledgor to collect where the amount due on the pledged instrument was apparently less than the debt it secured when the pledgee had refused to collect. *Baker v. Burkett*, 75 Miss. 89, 21 So. 970 (1897). The court concludes that such non-holder pledgors would be permitted to collect only by judicial process which includes the pledgee as a party.

In addition, there appears to be a substantial question as to whether a pledgor who has defaulted on his obligation to the pledgee may collect in any event. "The general rule is that the pledgor cannot maintain an action on the collateral while

the condition is not performed, and the pledgee of a collateral, where the condition has not been performed, is held to be the party in interest to maintain an action thereon." *Winnemucca State Bank & Trust Co. v. Corbeil*, 42 Nev. 378, 178 P. 23 (1919). See also the opinion of the court in *Mitchell v. Automobile Owners Indemnity Underwriters,*, 19 Cal.2d 1, 118 P.2d 815 (1941), in which the court indicated that a defaulting pledgor could not collect when it stated that the pledgor could not enforce payment of the pledged instrument when payment of the debt it secured was barred by the statute of limitations. In *McCune v. Dynamics Research, Inc.*, however, the pledgor was in default and yet was permitted to collect its interest in the note. The court notes, however, that § 47–9–502(1) of the Tennessee Code provides that upon default it is the pledgee who has the right to collect whether or not the pledgor had previously been making collections on the instrument. It would appear to the court, therefore, that whether or not the pledgor is in default is significant and if it does not bar the right of the pledgor to collect altogether certainly is a factor which militates against any such right being asserted.

There are two significant Tennessee court decisions. In the case of *Union National Bank v. Waters*, 9 Tenn.App. 608 (1929), *cert. denied* (1929), the Court of Appeals had under consideration the effect of payments made by the makers to the pledgor. In holding that payment to the pledgor did not discharge the liability of the makers on the notes the court stated at 613:

The defendants unfortunately paid the balance then due on this note to parties not holders or authorized agents for the purpose of receiving payment, and who did not have the note in their possession. By such payment the instrument was not satisfied. The general rule is applicable that the maker of a negotiable promissory note can satisfy it only by payment to the holder or to his duly authorized agent for that purpose. [citations omitted]

In this case the amount due on the pledged note was less than the debt it secured. Thus, this court held in effect that under

such circumstances a non-holder pledgor did not have the right to collect the pledged instrument.

The other pertinent decision is *Wade v. Vaughn*, 9 Tenn.App. 101 (M.S.1928). In that case the pledgee bank had returned the note to the pledgor and the court sustained the pledgor's right to collect it. The court permitted the pledgor to bring suit in his own name not, however, because of his status as pledgor but because of his status as holder, citing the provision in the Negotiable Instruments Law comparable to §§ 47–3–301 & –603 of the current Tennessee Code. The court stated commencing at 102:

This transaction, as a matter of law, enabled Wade to sue on the rent note as the holder within the meaning of section 51 of chapter 94 of the Acts of 1899, Shannon's Code, sec. 3516a59, which is as follows:

'The holder of a negotiable instrument may sue thereon in his own name; and payment to him in due course discharges the instrument.'

The bank, as pledgee, parted with possession of the note and constituted Wade its agent, or trustee, for the purpose of collection and to bring suit to that end, if necessary. The rule is that such an agent or trustee having possession may sue on the note in his own name.

Thus, Tennessee courts have not recognized a right in pledgors to collect in derogation of the general rule that only holders may do so.

It is abundantly apparent from the foregoing that the Allens and their attorney, Mr. Turner, had absolutely no right to collect the Note as pledgors. They have argued that the fact that SPCA also held another note secured by a second mortgage deed of trust on "Rattle and Snap" created a conflict of interest which in some manner adversely affected the Allens' interest in seeing to it that the Note was paid. No proof was submitted, however, of any reluctance on the part of SPCA to collect the Note and foreclose on "Rattle and Snap." The only concern expressed by the president

of SPCA was as to the amount of the fee that would be charged by Mr. Allen's attorney if he handled the foreclosure. This was a legitimate and as matters developed genuine concern and SPCA had every right to set limits on the amount of attorneys' fees to be paid from the proceeds of sale. It should have been a matter of greater concern to Mr. Allen. Under the terms of the installment deed the attorney would be paid before any of the proceeds of sale were applied to the debt. All SPCA had requested of Mr. Allen was that the fee charged by the attorney not exceed $1,000. The real conflict of interest was that of the Allens whose only interest was to have the principal and interest paid on their debt to SPCA. Obviously this conflict of interest militated against the Allens collecting the Note.

There are, of course, additional grounds for denying the Allens' claim for reimbursement of attorneys' fees and collection expenses. It is the responsibility of any court in reviewing an application for such fee to inquire into whether such services were required in the first place. *E. g., Quaker Oats Co. v. Burnett*, 289 F.Supp. 283 (E.D. Tenn.1968). As indicated above, only minimal attorney assistance was required to file the claim in this court and no such assistance was required of the Allens to ensure payment in full of the principal and interest due on the Note. SPCA will be paid the full amount due, the only impediments thereto having been those created by the Allens and more specifically by their attorney, Mr. Turner. With respect to the legal services rendered to the Allens prior to the initiation of these Chapter XII cases, the record indicates that no services of any kind were rendered by Mr. Turner relative to the collection of the note—he did not even write the Frosts the customary demand letter—other than to initiate the foreclosure proceeding which he had no authority to do under the terms of the installment deed. Even assuming that the Allens had the right to collect as pledgors, that instrument expressly provided that foreclosure could be authorized only by the "holder and owner" of the Note. In addition, Mr. Turner was never employed to collect the Note itself. The testimony of both Mr. Turner and Mr. Allen was very precise. Both stated that Mr. Turner was employed to "collect the debt." The court also notes that the failure to write the Frosts a demand letter, particularly since Mr. Allen had indicated to Mr. Frost that he would work with him as long as he could, militates against the award of attorneys' fees. Even more significant, however, is the failure of Mr. Allen or Mr. Turner to make demand on SPCA to foreclose. It is apparent to the court that such demand would have been quickly acceded to by SPCA and would have spared Mr. Allen having to become obligated for any but the barest minimum of legal fees. Apparently such a demand letter was not written by Mr. Turner because he was not advised by Mr. Allen that SPCA held the Note. Mr. Turner did not, however, inquire of Mr. Allen as to who did hold the Note and his failure to do so is, in the opinion of the court, such a significant omission as to raise a substantial question as to whether Mr. Allen has any obligation to Mr. Turner for the payment of any fees in connection with this matter. Because the court has concluded that the Allens are not entitled to reimbursement for such fees in any event, it is not necessary that it do so and the court expressly refrains from resolving the issue of the extent of the Allens' liability to Mr. Turner.[2]

An appropriate order will be entered.

---

2. An additional consideration is the contingent nature of the fee arrangement between Mr. Allen and Mr. Turner. Both indicated that if the amount realized from the sale of "Rattle and. Snap" was less than the principal and interest due on the Note, Mr. Turner nevertheless would be entitled to 10% of the proceeds as his fee. Assuming that the Allens as pledgors had the unrestricted right to collect the Note and proceed unilaterally with the foreclosure, they had no right to enter into such a fee arrangement which was in derogation of the right of SPCA to all of the principal and interest as a secured party with a perfected security interest in the Note. No question has been raised as to the validity of SPCA's security interest in the Note, which was created and perfected by SPCA taking possession of it long before Mr. Turner appeared on the scene. Tenn.Code Ann. §§ 47–9–304 & –305.